[No. 21134. In Bank.—January 17, 1895.]

THE PEOPLE, RESPONDENT, *v.* DOMINGO BORDA, APPELLANT.

CRIMINAL LAW—POLLUTION OF WATER SUPPLY—PENNING OR CORRALLING OF SHEEP—CONSTRUCTION OF CODE. — Under section 374 of the Penal Code, which makes it a misdemeanor to keep any sheep or other livestock penned, corralled, or housed on, over, or on the borders of any stream, the waters of which are used for the supply of the inhabitants of any city or town, and which are thereby polluted, the offense is committed by causing a large band of sheep to be daily driven to the banks of the stream and herded together by the aid of men and dogs, in, along, and upon the stream, for a considerable part of the day, and causing the bed and banks of the stream to be polluted by the sheep.

ID.—MEANING OF STATUTE.—The language of the statute "penned," "corralled," or "housed on, over, or on the borders of any such stream," imports that the animals may be inclosed by means other than an ordinary pen or corral, as such structures are not usually built on, or over a stream; and such use of the words "pen" and "corral" is authorized.

ID.—USAGE OF WORD "CORRAL"—TESTIMONY.—The word "corral" comes from the Spanish language, and is to be construed according to its approved usage; and it is proper for a witness whose qualification is not questioned to testify that where a band of sheep are kept bunched to-

gether and watched by men and dogs, it is understood among stock-men as "corralling."

Id.—Evidence—Discoloration and Impurity of Water.—Evidence is competent to show that the natural color of the water was perfectly clear in seasons prior to the herding of the sheep, and that it was very impure and discolored by sheep manure after the herding of the sheep.

Harmless Error—Order Striking Out Evidence.—Where an objection to evidence has been overruled, the ruling is rendered harmless by a subsequent order striking out the evidence.

Appeal from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial.

The facts are stated in the opinion.

*Paris & Allen* for Appellant.

*Attorney General W. H. H. Hart, Deputy Attorney General William H. Layson,* and *District Attorney Frank F. Oster,* for Respondent.

Belcher, C.— The information charges that the defendant " on the twenty-seventh day of June, 1893, at the county of San Bernardino, state of California, did willfully and unlawfully keep a large number of sheep, to wit: about two thousand sheep, penned and corralled in, over, and on the banks of that certain stream of water known as the East Fork of the Mojave river, so that by reason of keeping said sheep so penned and corralled as aforesaid the waters of said stream then and there became polluted; and from which said stream water was then and there, ever since has been, and now is, drawn for the supply of the inhabitants of the town of Hesperia, said Hesperia being then and there a town in the state of California."

The charge was made under section 374 of the Penal Code, as amended March 3, 1893, which makes it a misdemeanor to keep any sheep or other livestock penned, corralled, or housed on, over, or on the borders of any stream, the waters of which are thereby polluted, and are drawn for the supply of the inhabitants of any city or town in this state.

The defendant was convicted, and has appealed from the judgment and an order denying his motion for a new trial.

It was proved that the town of Hesperia had a population of three or four hundred people, who were supplied with water taken from the East Fork of the Mojave river and conducted through an open ditch about four miles, and then through a fourteen-inch pipe about eight miles; and that the water in its normal condition was very clear and pure, but that in June, 1893, it was so fouled with sheep manure as to be badly discolored and made entirely unfit for use.

It was also proved that in May and June, 1893, the defendant had a band of two thousand or more sheep, which he daily drove to the banks of the said stream, a little above the head of the Hesperia ditch, and there by the aid of men and dogs herded them together in, along, and upon the stream for a considerable part of each day, and that the bed and banks of the stream were covered with manure dropped by the sheep.

J. F. Pike was called as a witness for the prosecution, and testified that he was on the East Fork of the Mojave river on the 14th of July, and saw a large band of sheep there which the defendant claimed. He was then asked: " Did you, when you were there, notice any corrals or structures along the eastern fork of the Mojave river"? · The defendant objected to the question on the ground that it was irrelevant, immaterial, and incompetent, because the time was subsequent to any act charged in the information. The objection was overruled and an exception reserved. The witness then testified that he saw a place which sheepmen call a corral, and went on to describe it. On cross-examination the witness stated that the corral which he had described was not on the East Fork of the river, but on a tributary, and thereupon, on motion of defendant, the testimony as to the corral was stricken out. The order overruling defendant's objection to the question propounded by the plaintiff is assigned as error, but, conceding that the

ruling was erroneous, still it was rendered harmless by the subsequent order striking the evidence out.

Perry Blackburn was a witness for the prosecution, and stated that he was present when the defendant was arrested; that it was on the East Fork of the Mojave river, and that defendant was there with a band of about two thousand sheep. He also stated that he had seen the defendant with the sheep there before in May and the early part of June.

The witness was then asked to explain how he saw the sheep in and along and on the stream, and said:

" They come in the stream about 10 o'clock, and the sheep, as a rule, drink and lay down; they don't have to be herded. If they commence to start away on any point they send their dogs after them and the dogs bunch them up. The men hardly ever leave the camps, and the men, as a general rule, sleep in the middle of the day, and in the afternoon, about 4 o'clock, they start the sheep out and they come back just at night, dark, and their sheep is so trained that they don't have any manufactured corrals. They stand themselves, with herders sleeping around them and their dogs."

The witness was next asked: " Where a band of sheep are kept bunched together that way and watched by men and dogs, isn't that understood among stockmen as corralling "?

The defendant objected to the question on the ground that it called for an opinion, and was a question for the jury to determine. The objection was overruled, and this ruling is assigned as error.

We see no prejudicial error in the action of the court complained of. The objection was not, as claimed, that the witness was not shown to be an expert, and hence not qualified to answer the question. And the answer sought was simply as to what stockmen understand constitutes the corralling of sheep. The word "corral" comes from the Spanish language, and is to be construed according to its approved usage. (Pen. Code, sec. 7,

subd. 16.) It was proper, therefore, to show what that usage is among stockmen.

Henry Johnson was a witness for the prosecution, and testified that he had had charge of the Hesperia waterworks for two years. He was asked: "How is the discoloration and impurity in that water compared this season with what it was last season, prior to the twenty-seventh day of last June"?

This question was objected to by defendant as irrelevant, immaterial, and incompetent, and the objection was overruled.

It is urged that this ruling was erroneous, but we think it clearly correct. It was entirely competent to' show how and to what extent the water had been polluted. The witness said: "The natural condition of that water is perfectly clear—clear as crystal. In the last three or four months—May, June, and July, and up to now—it has been pretty bad. It is very bad, colored brown. The discoloration is caused by sheep manure. We scraped it up by the bushel, wagon-load, up at the head of the ditch, and two or three miles in the bed of the river and on the sides."

The court instructed the jury: "That to pen means to confine in a small inclosure or narrow place, and that to corral means to surround or inclose, to coop up, to put into a close place. This need not necessarily be done by means of an artificial structure, but may also be done by means of, or through the agency of, men and dogs, either alone or in conjunction with natural or artificial barriers of an inanimate nature."

The appellant contends that this instruction was erroneous; and it is said: "The vice of this instruction is that the words *pen* and *corral* are given a definition that is unusual and figurative, and not according to the context either of the statute or of the information."

The language of the statute is, "penned, corralled, or housed on, over, or on the borders of any such stream." This plainly implies that, within the meaning of the statute, the animals may be inclosed by means other

than an ordinary pen or corral, as such structures are not usually built *on* or *over* a stream. And such use of the words "pen" and "corral" is authorized. (See Century Dictionary.)

The instruction was proper, and the appellant has no valid ground of complaint.

The judgment and order appealed from should be affirmed.

SEARLS, C., and HAYNES, C., concurred.

For the reasons given in the foregoing opinion the judgment and order appealed from are affirmed.

> HARRISON, J.,     VAN FLEET, J.,
> McFARLAND, J.,     GAROUTTE, J.,
> HENSHAW, J.